UNITED STATES DISTRICT COURT WESTERN DISTRICT
OF NORTH CAROLINA CHARLOTTE DIVISION
Civil Action No. 3:26-CV-00655

| | |
|---|---|
| Robert Propst,<br><br>Plaintiff,<br><br>v.<br><br>Wells Fargo & Company,<br><br>Defendant. | **PLAINTIFF'S FIRST AMENDED COMPLAINT** |

NOW COMES Plaintiff Robert Propst ("Plaintiff" or "Propst"), by and through undersigned counsel, pursuant to Rule 15a and 15c of the Federal Rules of Civil Procedure amends his Complaint against Defendant Wells Fargo & Company ("Defendant" or "Wells Fargo") to include additional facts and additional causes of action. Plaintiff alleges as follows:

## PARTIES, JURISDICTION AND VENUE

1. Plaintiff Mr. Robert Propst is a citizen and resident of Rowan County, North Carolina. At all times relevant to this action, Plaintiff was employed by Defendant Wells Fargo & Company and performed his work in Charlotte, Mecklenburg County, North Carolina.

2. Defendant Wells Fargo & Company is, upon information and belief, a Delaware corporation authorized to transact and transacting business in the State of North Carolina, including in Mecklenburg County, where it maintains offices and regularly employs fifteen (15) or more employees. At all relevant times, Wells Fargo & Company was Plaintiff's "employer" within the meaning of N.C. Gen. Stat. § 143-422.2.

3. At all relevant times, Sandra Vasquez ("Vasquez"), Michael Cleary ("Cleary"), and Jim Merrick ("Merrick") were agents of and employed by Wells Fargo & Company and participated in the events described herein. Although referenced herein for context, they are not presently named as Defendants, and Plaintiff reserves the right to amend this Complaint to add additional parties as discovery may warrant. Further, Vasquez, Cleary, and Merrick are no longer employed by Defendant.

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff asserts a claim arising under the laws of the United States, namely 42 U.S.C. § 1981. This Court has supplemental jurisdiction over Plaintiff's related North Carolina state-law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to Plaintiff's federal claim that they form part of the same case or controversy—arising from the same common nucleus of operative fact.

5. This Court has personal jurisdiction over Defendant because Wells Fargo & Company maintains offices in, is registered to do and regularly and systematically transacts business in, and committed the acts and omissions complained of within this judicial district and the State of North Carolina.

6. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this district, Plaintiff performed his employment in this district, and Defendant resides in, and is subject to personal jurisdiction, in this district.

7. All conditions precedent to the institution of this action have been performed or have otherwise occurred. Plaintiff's claims arise under the common law and public policy of the State of North Carolina and under 42 U.S. Code § 1981; therefore, do not require the filing of a charge

with the Equal Employment Opportunity Commission, or the receipt of a notice of right to sue, as a prerequisite to suit.

## FACTUAL ALLEGATIONS

8. Plaintiff graduated from the University of North Carolina at Chapel Hill with a degree in Accounting in 1982.

9. After approximately three years as a tax accountant at KPMG, Plaintiff joined First Union National Bank in April 1985.

10. Through a series of mergers and acquisitions—including the merger of First Union National Bank with Wachovia in 2001, and Wells Fargo's acquisition of Wachovia in 2008—Plaintiff remained continuously employed, ultimately by Defendant, until his constructive discharge in August 2023.

11. Over the course of approximately thirty-eight and one-half (38.5) years of continuous service, Plaintiff advanced through the organization to become a Senior Vice President.

12. Throughout his career, Plaintiff consistently received performance ratings of "Exceeds Expectations" and, on multiple occasions, the highest rating available, "Far Exceeds Expectations."

13. In nearly four decades of employment, Plaintiff never received a performance rating below "Meets Expectations" / "Performing"—until Vasquez became his manager.

14. At the time of his forced departure, Plaintiff earned a base salary of approximately $201,000 and annual bonus compensation of approximately $95,000, totaling approximately $296,000 annually. Further, Plaintiff had received regular annual merit increases of approximately three percent.

15. On September 8, 2016, the Consumer Financial Protection Bureau ("CFPB") issued a Consent Order against Wells Fargo addressing systemic misconduct.

16. In response, in 2017 Wells Fargo established the Rebuilding Trust Office ("RTO")—a central compliance and remediation team responsible for fulfilling the Consent Order's mandates. Plaintiff was one of the original leaders of this critical compliance function.

17. Plaintiff was tasked with building and leading a team to address each CFPB issue and with coordinating directly with external monitors, including but not limited to Grant Thornton LLP and Mayer Brown LLP.

18. Under Plaintiff's leadership, his RTO team—composed predominantly of Black employees—developed rigorous workflows, tracking systems, daily reporting, and cross-functional coordination processes.

19. These efforts culminated in Defendant's achievement of its objective of lifting the CFPB Consent Order in September 2021, a significant regulatory milestone for Defendant.

20. Because of this success, Plaintiff and his team were subsequently assigned to work on the OCC Consent Order and Federal Reserve Board Consent Order matters—further reflecting Wells Fargo's confidence in Plaintiff's leadership and performance.

21. In the fall of 2022, following a series of leadership changes directed by Wells Fargo's Senior Executive Vice President Michael Cleary, and involving Wells Fargo's employees April Meadows, Ryan Miller, and Ryan Baum, Plaintiff and his team were reassigned to report to Vasquez, who, along with April Meadows, reported to Michael Cleary.

22. Almost immediately, Vasquez, who was based in Chicago, expressed skepticism about the value of Plaintiff and his team. Despite her frequent travel to Charlotte, North Carolina, Vasquez, on behalf of Defendant, repeatedly declined to meet in person with Plaintiff or his Charlotte-based

team, whose membership was predominantly Black; such conduct reinforced Vasquez's preconceived and derogatory views concerning Plaintiff and his team.

23. In October 2022, alarmed by Vasquez's pattern of sidelining and marginalizing him and his team, Plaintiff traveled to Chicago at his own expense to spend a full week with Vasquez to express his discontent concerning him and his team's marginalization. During this trip, Propst further walked Vasquez through his team's workflows, metrics, and processes.

24. Plaintiff's good-faith efforts were met not with support, but with resistance and retaliation, including continued efforts to diminish the roles of Plaintiff and his team.

25. Plaintiff has suffered from diminished vision since 2016. This impairment substantially limits one or more major life activities, including the major life activity of seeing, especially in inclement weather and/or at night.

26. Wells Fargo placed Plaintiff on medical disability on three separate occasions due to this condition, formally recognized Plaintiff as visually disabled when he returned to work in 2017, and approved accommodations for his condition.

27. Over the following years, Wells Fargo approved numerous accommodations, including, *inter alia*, remote-work arrangements that remained in place through Plaintiff's departure and extra-large computer monitor(s) with large-print type. These accommodations did not negatively affect Plaintiff's job performance, as reflected in his strong performance reviews during the relevant periods.

28. Following COVID-related return-to-office initiatives, Wells Fargo implemented a standardized accommodation-recertification process. Plaintiff complied fully, worked with his physicians, and submitted all required documentation, and his remote-work accommodation was formally approved under Defendant's new standards and process.

29. Nevertheless, in 2022, immediately after Plaintiff's reassignment, Vasquez, on behalf of Defendant, repeatedly pressured Plaintiff to abandon remote work, asserting that he would be "more effective in the office," despite his approved accommodation.

30. In fact, Plaintiff had several conversations with Vasquez during which Vasquez purported to "suggest" that Plaintiff report to the office earlier and leave before dark. Plaintiff's residence is approximately forty-eight (48) miles from the Charlotte office—an approximately 100-mile round-trip commute that Plaintiff's visual impairment made especially difficult and dangerous, and that his approved remote-work accommodation existed to avoid. That proposed arrangement did not address Plaintiff's limitations because driving in adverse weather conditions—including rain and thunderstorms—was more difficult and dangerous for Plaintiff than driving at night. Moreover, such inclement weather itself frequently caused the sky and roadways to become dark, even during ordinary daylight hours. Neither Plaintiff nor Defendant could reliably forecast when those conditions would arise or determine in advance when Plaintiff would need to leave the office to avoid driving in darkness and/or adverse weather conditions. Accordingly, requiring Plaintiff to commute during nominal daylight hours was not a viable accommodation, particularly given that inclement weather could itself create dark and hazardous driving conditions before sunset and despite Plaintiff's documented record of exceptional service while working remotely.

31. Vasquez, on behalf of Defendant, repeatedly seized upon isolated instances of Plaintiff's voluntary in-office presence—during trips to Chicago at her request—as a pretext to challenge his approved accommodation at the Charlotte office.

32. This scrutiny escalated alongside Defendant's use of badge "swipe reports," notwithstanding that Plaintiff was expressly exempt from such monitoring by reason of his medical accommodation.

33. Plaintiff complained about this discriminatory conduct and about the interference with his approved accommodation to, *inter alia*, Vasquez and Baum.

34. Vazquez' discriminatory and harassing conduct only escalated after that.

35. Prior to Vazquez, Plaintiff nor his team, were subjected to discriminatory treatment.

36. Throughout his tenure under Vasquez, Plaintiff—then the oldest member of Vasquez's leadership team by more than a decade—was repeatedly subjected to age-based comments.

37. Among other things, Vasquez, on behalf of Defendant, asked whether Plaintiff was the oldest person on her team, referenced his longevity as a liability, emphasized the need for "fresh ideas," and ultimately asked Plaintiff, "[I]sn't it about time for you to retire?"

38. Plaintiff objected to this discriminatory treatment.

39. Vasquez, on behalf of Defendant, likewise refused to support Plaintiff's continued leadership within Wells Fargo's PRIDE organization, where Plaintiff had been a foundational and nationally recognized leader for over two decades, telling him that he had "served long enough" and that it was time for "younger leadership with fresh ideas."

40. This conduct created a work environment that a reasonable person would find intimidating, hostile, or abusive.

41. Plaintiff engaged in protected activity by complaining, in good faith, of discrimination and of interference with his approved disability accommodation to Vasquez, Human Resources, and Baum (before his termination by Cleary).

42. Plaintiff could not escalate his complaints to Mr. Cleary, the Company's Senior Executive Vice President and Ms. Vasquez's direct supervisor, because Plaintiff was aware that Cleary had previously terminated multiple Wells Fargo leaders who had challenged, disagreed with, or otherwise "caused problems" for senior leadership, including Elizabeth Atkins, Ryan Miller, and Ryan Baum, each of whom had served as Plaintiff's direct supervisor immediately before

Vasquez. Because Cleary had terminated all three of those supervisors, as well as other Wells Fargo leaders under similar circumstances, Plaintiff reasonably feared that escalating his concerns to Cleary would result in his own termination, as Plaintiff himself held the leadership position of Senior Vice President.

43. Further, Plaintiff complained to Vasquez and Human Resources that his predominantly Black team was being subjected to disparate and less favorable treatment because of their race, and objected that race was improperly influencing the treatment of his team. In the course of his employment, Plaintiff advocated on behalf of his team for equal treatment, including by challenging disparate discipline, objecting to racially biased evaluations, advocating for equal promotions and compensation, escalating his concerns to Human Resources and senior leadership.

44. By way of example only, and without limitation, Plaintiff specifically objected to the year-end 2022 and mid-year 2023 performance ratings that Vasquez assigned to Mr. Jamelle Cuthbertson[1], Ms. LaWanda Blair-Foster, and Ms. Kenisha Wright, which Plaintiff believed reflected the same disparate and less favorable treatment affecting his predominantly Black team. Plaintiff had not encountered comparable concerns regarding the treatment or evaluation of his team under his prior supervisors, including Baum, Miller, or Elizabeth Atkins. These objections

---

[1] *See* Jordan, C. (2026) Ex-Wells Fargo Exec sues bank over racial, Disability claims | Charlotte Observer. Available at: https://www.charlotteobserver.com/news/business/article315935560.html (Accessed: 06 August 2026) (Former Wells Fargo Vice President Jamelle Cuthbertson filed a lawsuit alleging race and disability discrimination, retaliation, and violations of family and medical leave laws after the bank eliminated his position while he was on approved paternity leave. Cuthbertson alleges that, despite a history of strong performance, he was subjected to racially charged comments, removed from significant projects, criticized for leading a predominantly Black team, and given a negative performance review that was later withdrawn following an internal investigation that reportedly resulted in his supervisor's termination. He further claims that Wells Fargo challenged his medically supported remote-work accommodation following quadruple-bypass surgery, treated similarly situated white employees more favorably during a restructuring, and initially misreported his separation as a voluntary resignation, delaying his unemployment benefits.)

were only some of the many instances in which Plaintiff challenged what he believed to be racially influenced employment decisions and advocated for the equal treatment of his team.

45. During the relevant period, Plaintiff supervised both African American and Caucasian employees who were subject to Defendant's performance evaluation and rating procedures.

46. Defendant Vasquez repeatedly challenged, questioned, and scrutinized the performance evaluations and ratings Plaintiff assigned to his African American subordinates, while not similarly challenging or questioning the performance evaluations and ratings Plaintiff assigned to his Caucasian subordinates.

47. This disparate treatment occurred notwithstanding that Plaintiff's African American and Caucasian subordinates were evaluated under the same general performance evaluation standards and procedures.

48. Defendant Vasquez's selective scrutiny of Plaintiff's African American subordinates was not an isolated occurrence but constituted a recurring pattern of differential treatment based upon the race of the employees being evaluated.

49. Plaintiff recognized and objected to the racially disparate treatment, specifically communicating his concerns to Defendant Vasquez and Wells Fargo management that African American employees were being subjected to heightened scrutiny and less favorable treatment compared to similarly situated Caucasian employees.

50. Plaintiff opposed Defendant Vasquez's efforts to subject his African American subordinates to different performance evaluation standards and advocated that all employees under his supervision be evaluated fairly and consistently without regard to race.

51. Following Plaintiff's objections, Defendant Vasquez subjected Plaintiff to increasingly hostile and retaliatory treatment, including undermining his professional authority,

marginalizing his leadership responsibilities, and ultimately assigning Plaintiff an unprecedented negative performance evaluation.

52. Defendant Vasquez's selective challenges to the evaluations of African American employees, coupled with her subsequent retaliatory treatment of Plaintiff for opposing those practices, support the inference that Plaintiff's protected opposition to racial discrimination was a substantial motivating factor in the adverse actions taken against him and ultimately a but-for cause of his constructive discharge.

53. Following Plaintiff's opposition to Defendant Vasquez's racially disparate treatment of his African American subordinates, including her unilateral reduction of their performance ratings, Plaintiff experienced escalating adverse employment actions. These actions included the marginalization of his leadership authority, continued challenges to his professional judgment, and the issuance of the first negative performance evaluation of his nearly thirty-eight-and-one-half-year career. The sequence and timing of these events, together with Defendant Vasquez's knowledge of Plaintiff's opposition to racial discrimination and his previously exemplary employment record, support an inference that Plaintiff's protected activity was a but-for cause of the retaliatory treatment he experienced.

54. Plaintiff is a White, gay man who is married to a Black spouse.

55. During a one-on-one Zoom call, upon seeing Plaintiff's husband and realizing that Plaintiff—a White man—was married to a Black man, Vasquez reacted with visible surprise, disapproval, and dismay and remarked that Plaintiff's husband's race "wasn't what [she] expected," before abruptly changing the subject.

56. On multiple occasions, Vasquez made sarcastic remarks to the effect that Defendant's "diversity numbers" had improved after Plaintiff's predominantly Black team came under her supervision.

57. Vasquez, on behalf of Defendant, subjected the members of Plaintiff's predominantly Black team to disparate and less favorable treatment than comparable non-Black employees because of their race, including disparate discipline, biased performance evaluations through the forced 'bell curve', exclusion from meetings and opportunities, and unequal pay or promotion opportunities.

58. These statements, together with Vasquez's refusal to meet with Plaintiff's predominantly Black team and her persistent marginalization of that team, evidence race-based and associational animus.

59. As discussed in further detail herein below, Plaintiff made complaints to Vasquez and Defendant's Department of Human Resources concerning such discriminatory comments and acts without any remedial actions taken by Defendant, leading to his constructive discharge.

60. Vazquez' continued negative remarks about Plaintiff's sexually and age were made in front of others and meant to embarrass him in front of his peers and subordinates.

61. Despite never having been told that he was underperforming, Plaintiff received a mid-year 2023 performance rating of "Inconsistently Meets Expectations"—the first negative rating of his nearly four-decade career.

62. Vasquez, on behalf of Defendant, acknowledged that this rating was driven by a forced "bell curve," and by her dissatisfaction with Plaintiff's (predominantly Black) team, rather than by Plaintiff's actual performance—notwithstanding her own refusal to support or engage with that team.

63. Vasquez's comments during the 2023 mid-year review—including, but not limited to, references to retirement and to Plaintiff's age—made clear that the rating was pretextual and was intended to force Plaintiff out of his employment.

64. This unwarranted rating had a direct and substantial negative impact on Plaintiff's professional standing.

65. All of these negative actions and discriminatory and harassing treatment only occurrent after Plaintiff began fighting for equitable, non-discriminatory treatment for his subordinates.

66. Plaintiff believed that Vazquez's and Defendant's negative treatment of Plaintiff's subordinates were because they were Black and he communicated that to Vazquez and the management at Wells.

67. Plaintiff's complaints were met with retaliatory actions.

68. Wells Fargo, including the decision-makers who assigned Plaintiff's negative performance rating and effected his separation (i.e., *inter alia*, Vasquez), were aware of Plaintiff's complaints and protected opposition.

69. Within days after Plaintiff's complaints, and in marked departure from his decades-long record, Plaintiff was subjected to escalating hostility and discrimination, reputational harm, the first negative performance rating of his career, and increasingly untenable working conditions.

70. The cumulative effect of Defendant's conduct—including the pretextual negative performance rating, the age-based pressure to retire, the sustained attacks upon his medical accommodation, the marginalization of Plaintiff and his team, and the direct threat to his compensation and professional standing—rendered Plaintiff's working conditions so intolerable that a reasonable person in his position would have felt compelled to resign.

71. The negative performance rating confirmed to Plaintiff that Defendant had determined to force him out and that no remedial action would be taken despite his complaints.

72. The cumulative and escalating conditions, culminating in that rating, rendered Plaintiff's continued employment intolerable, and shortly thereafter on or about August 11, 2023, at age 63,

Plaintiff was forced into early retirement and thereby constructively discharged, despite his intention and ability to continue working until the full retirement age (67) in April 2027.

73. Defendant Vasquez, acting in her supervisory capacity and within the course and scope of her employment with Defendant Wells Fargo, engaged in a continuous and escalating pattern of discriminatory harassment, intimidation, humiliation, and retaliation directed toward Plaintiff.

74. Defendant Vasquez's conduct was not limited to isolated disagreements regarding Plaintiff's performance or ordinary workplace management decisions. Rather, her conduct included repeated discriminatory comments concerning Plaintiff's age, pressure to retire, derogatory treatment related to Plaintiff's sexual orientation and interracial marriage, and sustained efforts to undermine Plaintiff's professional reputation and continued employment.

75. Defendant Vasquez knew that Plaintiff suffered from a documented visual impairment that substantially limited his ability to drive safely, particularly during darkness and inclement weather. Defendant Vasquez further knew that Wells Fargo had formally approved Plaintiff's remote-work accommodation because of these limitations.

76. Notwithstanding this knowledge, Defendant Vasquez repeatedly challenged Plaintiff's medically approved accommodation and pressured Plaintiff to resume commuting approximately 100 miles round trip, despite the known risks associated with his visual impairment.

77. Defendant Vasquez's repeated challenges to Plaintiff's accommodation were made despite Plaintiff's established history of exceptional job performance while working remotely and the absence of any legitimate performance-related necessity requiring Plaintiff to abandon his accommodation.

78. Defendant Vasquez also repeatedly targeted Plaintiff because of his age, questioned whether he was the oldest member of her leadership team, characterized his lengthy professional experience as a liability, and suggested that Plaintiff should retire.

79. Defendant Vasquez further made derogatory and humiliating comments concerning Plaintiff's age and sexuality in the presence of Plaintiff's professional colleagues and subordinates, thereby undermining his professional authority and subjecting him to embarrassment and humiliation.

80. Plaintiff objected to Defendant Vasquez's discriminatory conduct and repeatedly complained about the discriminatory treatment directed toward himself and the predominantly Black employees under his supervision.

81. Rather than investigate and remedy the complained-of conduct, Defendant Wells Fargo permitted the discriminatory and retaliatory treatment to continue, and Plaintiff was subjected to escalating hostility, professional marginalization, and adverse employment actions.

82. Defendant Vasquez ultimately assigned Plaintiff a negative performance evaluation notwithstanding his approximately thirty-eight and one-half years of consistently satisfactory or exceptional performance, including his successful leadership of significant regulatory compliance initiatives.

83. The negative evaluation was issued under circumstances supporting the inference that it was designed to undermine Plaintiff's professional standing, jeopardize his continued employment, and pressure him into premature retirement.

84. Defendants' conduct, considered collectively, constituted a sustained course of targeted harassment and retaliation that exploited Plaintiff's known medical vulnerability, attacked his personal dignity, and threatened the professional standing and livelihood he had developed over nearly four decades of employment.

85. Vasquez knew, or acted with reckless indifference to the substantial likelihood, that her repeated conduct would cause Plaintiff serious emotional and psychological harm.

86. Defendant Wells Fargo, through its management and Human Resources personnel, received notice of Plaintiff's complaints but failed to take effective corrective action, thereby permitting the alleged harassment and retaliation to continue.

87. As a direct and proximate result of Defendants' conduct, Plaintiff was compelled to retire approximately four years before his intended retirement date, causing substantial disruption to his professional career, financial expectations, and personal life.

88. Following Plaintiff's constructive discharge, Wells Fargo placed Jim Merrick—a substantially younger, straight, white male, approximately twenty years Plaintiff's junior—into Plaintiff's former role or a substantially similar position.

89. Wells Fargo did so without posting the position or soliciting applications, contrary to Defendant's usual and customary hiring procedures.

90. This irregular and preferential placement further reflects Defendant's discriminatory intent and undermines any contention that Plaintiff's constructive discharge was based upon legitimate, non-discriminatory reasons.

91. Merrick, a close lieutenant of Vasquez's at that time, routinely made racially derogatory comments directed toward Plaintiff's former team following Plaintiff's forced departure. Merrick was later investigated for such conduct, leading to his exit from Wells Fargo.

92. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered substantial economic losses—including lost wages, lost bonuses, lost benefits, lost seniority, and diminished career and retirement value—estimated to exceed $1.2 million.

93. Plaintiff has also suffered loss of professional reputation, loss of community standing, harm to his career trajectory, and severe emotional distress and mental anguish.

## COUNT I
## VIOLATION OF 42 U.S.C. § 1981
## (Race Discrimination and Retaliation for Opposing Race Discrimination)
## (Against Defendant Wells Fargo & Company)

94. Plaintiff re-alleges and incorporates paragraphs 1 through 93 as if fully set forth herein.

95. Title 42, United States Code, Section 1981 guarantees to all persons the same right to make, perform, enforce, and enjoy the benefits, privileges, terms, and conditions of a contractual relationship, including employment, as is enjoyed by white citizens.

96. Section 1981 protects all persons regardless of race. A plaintiff need not be a member of the racial group subjected to the underlying discrimination; a person who opposes race discrimination directed at others, including a white employee who advocates on behalf of his Black coworkers, is protected from retaliation for that opposition.

97. Plaintiff's employment relationship with Wells Fargo was a contractual relationship within the meaning of, and protected by, 42 U.S.C. § 1981.

98. Section 1981 prohibits retaliation against a person because he has opposed race discrimination. *See CBOCS West, Inc. v. Humphries*, 553 U.S. 442 (2008).

99. Plaintiff engaged in activity protected by 42 U.S.C. § 1981 when he, in good faith, complained about and opposed the race-based disparate treatment to which his predominantly Black team was being subjected because of their race, and advocated on their behalf, including but not limited to disparate discipline, biased performance evaluations through the forced 'bell curve', exclusion from meetings and opportunities, and unequal pay or promotion opportunities.

100. Wells Fargo was aware of Plaintiff's protected opposition.

101. Ms. Vasquez's own conduct—acting within the course and scope of her employment with Wells Fargo—confirms that race-based animus was at work and that Plaintiff's opposition was reasonable and made in good faith. During a one-on-one video call, upon seeing Plaintiff's

husband, Ms. Vasquez reacted with visible surprise and dismay and remarked that his race "wasn't what [she] expected." On multiple occasions, Ms. Vasquez made sarcastic remarks that Defendant's "diversity numbers" had improved once Plaintiff's predominantly Black team came under her supervision, and, despite her frequent travel to Charlotte, she repeatedly refused to meet that team in person.

102. Following, and because of, Plaintiff's protected opposition to both the racial discrimination of his Black team and of Plaintiff's interracial marriage with a Black man, Defendant subjected Plaintiff to materially adverse actions—including the first negative performance rating of his nearly four-decade career and the escalating, intolerable working conditions that culminated in his constructive discharge—actions that would dissuade a reasonable employee from opposing race discrimination.

103. The causal connection between Plaintiff's protected opposition and the adverse actions is established by, among other things: the close temporal proximity between Plaintiff's complaints and the adverse actions; the escalating hostility Plaintiff faced after he complained; the abrupt reversal in his performance evaluations after decades of "Exceeds" and "Far Exceeds Expectations" ratings; Ms. Vasquez's own admission that the negative rating was driven by her dissatisfaction with Plaintiff's predominantly Black team rather than by Plaintiff's performance; and Defendant's departures from their ordinary practices, including their placement of Plaintiff's replacement without posting the position or soliciting applications.

104. Section 1981 protects all persons, including White persons, from intentional race discrimination in the making, performance, and enjoyment of the benefits, privileges, terms, and conditions of a contractual relationship.

105. Section 1981 likewise prohibits discrimination against a person because of his race-based associations, including his marriage to, and his advocacy for and close association with, persons of another race.

106. Plaintiff—a White man married to a Black man, who built, led, and championed a predominantly Black team—was subjected to intentional discrimination because of the racial character of those associations. Vasquez's reaction to Plaintiff's interracial marriage, her derisive "diversity numbers" remarks concerning Plaintiff's Black team, and her marginalization of Plaintiff alongside that team, reflect that Plaintiff's race and his race-based associations motivated the adverse actions taken against him.

107. But for Plaintiff's race and his marriage to, and association with, Black persons, Defendant would not have subjected Plaintiff to the pretextual negative rating, the intolerable working conditions, and the constructive discharge alleged herein.

108. Any performance-based or business justification Defendant may assert for their treatment of Plaintiff is pretextual. The negative rating was the first of Plaintiff's career, was inconsistent with his decades-long record, was—by Ms. Vasquez's own admission—the product of a forced quota and dissatisfaction with his team rather than his work, and was accompanied by departures from Defendant's normal procedures. But for Plaintiff's protected opposition to race discrimination, Defendant would not have taken these adverse actions against him.

109. Ms. Vasquez, acting within the course and scope of her employment and as an agent of Wells Fargo, engaged in the retaliatory conduct alleged in this Count, and Wells Fargo directed, participated in, condoned, and/or ratified that conduct, intentionally causing the deprivation of Plaintiff's rights under 42 U.S.C. § 1981. Wells Fargo is therefore liable for that retaliation under Section 1981.

110. Defendant acted intentionally and with malice or reckless indifference to Plaintiff's federally protected rights.

111. As a direct and proximate result of Defendant's violation of 42 U.S.C. § 1981, Plaintiff has suffered damages, including lost wages, lost bonuses, lost benefits, and other economic losses, together with other compensatory damages. Plaintiff is further entitled to punitive damages and to an award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT II
## VIOLATION OF 42 U.S.C. § 1981
## CONSTRUCTIVE DISCHARGE IN VIOLATION OF 42 U.S.C. § 1981

112. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 111 as if fully set forth herein.

113. At all relevant times, Plaintiff maintained an employment relationship with Defendant Wells Fargo, which constituted a contractual relationship protected against racial discrimination and retaliation under 42 U.S.C. § 1981.

114. Section 1981 prohibits retaliation against individuals who oppose racial discrimination in the making, performance, modification, and enforcement of employment contracts, including individuals who oppose discriminatory treatment directed toward employees of another race.

115. During his employment, Plaintiff supervised a team consisting of both African American and Caucasian employees, and consistently advocated for the fair and equitable treatment of all employees without regard to race.

116. After becoming Plaintiff's supervisor in the fall of 2022, Vasquez repeatedly subjected Plaintiff's African American subordinates to heightened scrutiny and less favorable treatment than similarly situated Caucasian subordinates.

117. Specifically, Vasquez selectively challenged the performance evaluations and ratings Plaintiff assigned to his African American subordinates while declining to similarly scrutinize or challenge the performance evaluations of his Caucasian subordinates.

118. Vasquez directed Plaintiff to lower the performance ratings of his African American subordinates without issuing comparable directives concerning Caucasian employees whose evaluations were subject to the same general performance standards.

119. Plaintiff objected to Vasquez's directives, expressly communicating his belief that the selective reduction of African American employees' performance ratings constituted racial discrimination.

120. Plaintiff refused to implement the requested reductions because he believed the directives were discriminatory and inconsistent with the actual performance of the employees being evaluated.

121. In response to Plaintiff's objections, Vasquez exercised her supervisory authority to override Plaintiff's performance evaluations and unilaterally reduce the ratings assigned to his African American subordinates, while leaving the ratings of his Caucasian subordinates unchanged.

122. Plaintiff continued to oppose the discriminatory treatment, including by raising concerns with Vasquez, Human Resources, and other Wells Fargo management personnel regarding disparate performance evaluations, disciplinary practices, and employment opportunities affecting African American employees.

123. Plaintiff's objections and refusal to participate in the discriminatory treatment constituted protected opposition to racial discrimination under 42 U.S.C. § 1981.

124. Defendant Wells Fargo, through Vasquez and other management personnel, knew of Plaintiff's opposition to the discriminatory treatment of his African American subordinates.

125. Following Plaintiff's protected opposition, Vasquez subjected Plaintiff to escalating adverse employment actions, including marginalizing his leadership responsibilities, undermining his professional authority, questioning his professional judgment, and diminishing his standing within the organization.

126. Vasquez's treatment represented a marked departure from Plaintiff's previous employment experience, during which he had maintained an exemplary performance record and had successfully led significant regulatory compliance initiatives.

127. Prior to Vasquez becoming his supervisor, Plaintiff had never received a performance evaluation below "Meets Expectations" or "Performing" during approximately thirty-eight and one-half years of continuous employment.

128. Despite Plaintiff's longstanding record of successful performance, Vasquez assigned Plaintiff a mid-year 2023 performance rating of "Inconsistently Meets Expectations," the first negative performance evaluation of his nearly four-decade career.

129. Vasquez acknowledged that the negative evaluation was influenced by a forced performance-rating distribution and her dissatisfaction with Plaintiff's predominantly African American team, rather than identified deficiencies in Plaintiff's actual performance.

130. The negative evaluation was issued following Plaintiff's repeated opposition to Vasquez's discriminatory treatment of African American employees and under circumstances supporting an inference of retaliatory motive.

131. In addition to the negative evaluation, Vasquez repeatedly pressured Plaintiff to retire, made age-related comments concerning his continued employment, challenged his medically approved remote-work accommodation, and continued efforts to diminish his professional standing.

132. The retaliatory conduct was not limited to an isolated personnel decision but consisted of a continuing and escalating pattern of adverse treatment that undermined Plaintiff's authority, professional reputation, and ability to continue performing his leadership responsibilities.

133. Plaintiff repeatedly complained to Wells Fargo management and Human Resources regarding the discriminatory and retaliatory treatment, but Defendant failed to take effective corrective action.

134. Plaintiff reasonably believed that further escalation of his complaints would expose him to additional retaliation, particularly in light of his knowledge that senior leadership had previously terminated other executives who challenged management decisions.

135. Defendant's continued adverse treatment, the unprecedented negative performance evaluation, repeated pressure to retire, and failure to address Plaintiff's complaints cumulatively created an objectively intolerable working environment.

136. The negative evaluation was particularly consequential because it undermined the professional standing Plaintiff had developed over nearly four decades of employment and reinforced his belief that Defendant intended to force him from his position rather than permit him to continue working.

137. Plaintiff's working conditions became so intolerable that a reasonable person in his position would have felt compelled to resign rather than continue enduring the escalating retaliatory treatment.

138. As a direct result of these conditions, Plaintiff was compelled to retire on or about August 11, 2023, at approximately 63 years of age, despite his intention and ability to remain employed until April 2027.

139. Plaintiff's retirement was not a voluntary decision to end his career but was the foreseeable consequence of Defendant's sustained retaliatory conduct and failure to remedy the intolerable working conditions.

140. Plaintiff's protected opposition to racial discrimination was a but-for cause of the retaliatory actions taken against him and his resulting constructive discharge.

141. As a direct and proximate result of Defendant's unlawful retaliation and constructive discharge, Plaintiff suffered lost wages, lost employment benefits, lost future earnings, emotional distress, and other compensable damages.

142. Defendant's conduct constituted unlawful retaliation resulting in constructive discharge in violation of 42 U.S.C. § 1981.

## COUNT III
## NEGLIGENT RETENTION AND SUPERVISION

143. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 142 as if fully set forth herein.

144. At all relevant times, Plaintiff was employed by Wells Fargo pursuant to an employment relationship that conferred valuable contractual rights upon Plaintiff, including rights to the base compensation, annual bonus compensation, benefits, annual merit increases, and terms and conditions of employment described herein.

145. Vasquez was aware of Plaintiff's employment relationship with Defendant and of its material terms, including his compensation and bonus structure, as well as his approved medical accommodation.

146. Vasquez intentionally induced Wells Fargo not to continue its employment relationship with Plaintiff, and to alter the terms of that relationship to Plaintiff's detriment, by among other things assigning Plaintiff a performance rating she knew to be unwarranted and unsupported by

his actual performance, attacking and undermining his formally approved medical accommodation, marginalizing Plaintiff and his team within the organization, and pressing Plaintiff to retire—thereby rendering the conditions of Plaintiff's employment so intolerable that a reasonable person in his position would have felt compelled to resign, and causing his constructive discharge.

147. At all relevant times, Vasquez acted within the scope of her supervisory authority and employment with Defendant; however, in engaging in the conduct alleged herein, she acted without justification, from personal motives and animus toward Plaintiff, and not in furtherance of any legitimate business interest of Defendant. Vasquez was motivated by personal animus toward Plaintiff on account of his age, his sexual orientation, his marriage to a Black man, and his advocacy on behalf of his predominantly Black team, rather than by any good-faith assessment of Plaintiff's performance or of Wells Fargo's interests. Vasquez's own acknowledgment that Plaintiff's negative rating was the product of a forced "bell curve" and of her dissatisfaction with Plaintiff's team rather than with Plaintiff's work; her contemporaneous references to Plaintiff's age and retirement; and her refusal, despite frequent travel to Charlotte, to meet with the team whose work she purported to evaluate, each establish that Vasquez acted for reasons personal to herself and contrary to Wells Fargo's legitimate interests—interests that were served by the continued employment of a Senior Vice President with a thirty-eight-year record who had led Wells Fargo's successful effort to lift the CFPB Consent Order.

148. The conduct alleged in paragraphs 118 through 121 constitutes tortious interference with Plaintiff's employment relationship and is actionable under North Carolina law.

149. Vasquez committed the foregoing tortious conduct while employed by Wells Fargo and while occupying a position of supervisory authority over Plaintiff that Wells Fargo conferred upon her.

150. Wells Fargo knew, or in the exercise of reasonable care should have known, of Vasquez's unfitness for that position and of her propensity for and commission of such conduct. Wells Fargo acquired that knowledge through, among other things: Plaintiff's own good-faith complaints of discrimination and of interference with his approved medical accommodation, made to Vasquez, to Human Resources, and to Ryan Baum; Plaintiff's objections to the performance ratings Vasquez assigned to members of his team; and Wells Fargo's own subsequent investigation—prior to August of 2023—of conduct within Vasquez's organization.

151. Notwithstanding such knowledge, Wells Fargo negligently retained Vasquez in a position of authority over Plaintiff, negligently failed to supervise her, failed to investigate Plaintiff's complaints, and failed to take any reasonable step to prevent or curtail the conduct alleged herein.

152. As a direct and proximate result of Wells Fargo's negligent retention and supervision, Plaintiff suffered the injuries and damages alleged herein, in an amount to be proven at trial.

## COUNT IV
## Intentional Infliction of Emotional Distress (IIED)

153. Plaintiff incorporates by reference and realleges paragraphs 1 through 152 of this Complaint as if fully set forth herein.

154. Defendant Vasquez, while acting in her supervisory capacity at Wells Fargo, engaged in a continuous, deliberate, and escalating course of discriminatory harassment, intimidation, humiliation, and retaliatory conduct directed toward Plaintiff.

155. Vasquez's conduct extended beyond ordinary workplace disagreements, criticism, or disciplinary decisions and included repeated personal attacks upon Plaintiff's age, sexual orientation, interracial marriage, medical disability, and professional standing.

156. Vasquez repeatedly made derogatory and humiliating comments concerning Plaintiff's age, questioned whether he was the oldest member of her leadership team, characterized his lengthy tenure as a liability, and suggested that it was time for Plaintiff to retire.

157. Vasquez further subjected Plaintiff to humiliating comments concerning his sexual orientation and interracial marriage, including expressing disapproval upon learning that Plaintiff, a White man, was married to a Black man.

158. On multiple occasions, Vasquez made derogatory remarks concerning Plaintiff's age and sexuality in the presence of his colleagues and subordinates, thereby publicly embarrassing Plaintiff and undermining the professional authority he had developed over nearly four decades of employment.

159. Vasquez knew that Plaintiff suffered from a documented visual impairment that substantially restricted his ability to drive safely during darkness and inclement weather and that Wells Fargo had approved a remote-work accommodation to address those limitations.

160. Notwithstanding this knowledge, Vasquez repeatedly pressured Plaintiff to abandon his medically approved accommodation and commute approximately 100 miles round trip to the Charlotte office, despite the foreseeable safety risks associated with his visual impairment.

161. Vasquez continued challenging Plaintiff's accommodation despite his repeated explanations concerning the dangers of commuting and his established history of successfully performing his employment duties remotely.

162. Vasquez also engaged in conduct intended to undermine Plaintiff's leadership authority by selectively challenging the performance evaluations of Plaintiff's African American subordinates, directing Plaintiff to lower their ratings, and ultimately overriding Plaintiff's evaluations when he objected to the disparate treatment.

163. Following Plaintiff's objections to these racially discriminatory practices, Vasquez intensified her adverse treatment of Plaintiff, including marginalizing his professional responsibilities, questioning his judgment, and undermining his standing among his colleagues and subordinates.

164. Vasquez ultimately assigned Plaintiff the first negative performance evaluation of his approximately thirty-eight-and-one-half-year career, notwithstanding his longstanding record of satisfactory and exceptional performance.

165. The negative performance evaluation was issued under circumstances supporting the inference that it was intended to undermine Plaintiff's professional reputation, jeopardize his continued employment, and pressure him into premature retirement.

166. Plaintiff repeatedly complained about the discriminatory and harassing conduct to Vasquez, Human Resources, and other members of Wells Fargo management. Despite these complaints, Wells Fargo failed to take effective corrective action, allowing the conduct to continue.

167. Vasquez knew, or acted with reckless indifference to the substantial likelihood, that her repeated personal attacks, public humiliation, interference with Plaintiff's medical accommodation, and efforts to undermine his professional standing would cause Plaintiff severe emotional and psychological distress.

168. Defendant’s failure to address Vazquez conduct was an endorsement, authorization and ratification of  of Vazquez conduct.

169. Defendants' conduct, viewed in its entirety, was extreme and outrageous, exceeded all bounds of decency tolerated by a civilized society, and was not reasonably related to legitimate employment management or business objectives.

170. As a direct and proximate result of Vasquez's conduct, Plaintiff suffered significant emotional and psychological distress, including increased anxiety and depression.

171. Plaintiff sought professional mental-health treatment because of Vasquez's treatment and was diagnosed with increased anxiety and depression associated with the distress he experienced.

172. Plaintiff's emotional and psychological condition became sufficiently severe that he was required to increase the frequency of his therapy appointments to address his worsening symptoms.

173. Plaintiff's diagnosed anxiety and depression, together with his need for increased professional mental-health treatment, constituted severe emotional distress resulting directly and proximately from Defendants' conduct.

174. The continuing harassment, humiliation, and retaliatory treatment further contributed to Plaintiff's premature departure from his employment and substantially disrupted his professional and personal life.

175. Defendant Vasquez's conduct was intentional, malicious, or undertaken with reckless indifference to the substantial likelihood of causing severe emotional distress.

176. Defendant Wells Fargo is liable for Vasquez's conduct to the extent that she acted within the course and scope of her employment, or that Wells Fargo otherwise authorized or ratified her tortious conduct through personnel possessing authority to do so.

177. As a direct and proximate result of Defendants' extreme and outrageous conduct, Plaintiff suffered severe emotional distress, mental anguish, psychological injury, and damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays the Court as follows:

a. That Plaintiff have and recover compensatory damages from Defendant in an amount to be proven at trial—estimated to exceed $1.2 million;

b. That Plaintiff recover damages for lost wages, lost bonuses, lost benefits, lost seniority, and diminished career and retirement value, in an amount to be proven at trial;

c. That Plaintiff recover damages for emotional distress and mental anguish, in an amount to be proven at trial;

d. That Plaintiff recover punitive damages pursuant to N.C. Gen. Stat. § 1D-1, *et seq.*; and 42 U.S.C. § 1981;

e. That Plaintiff recover pre-judgment and post-judgment interest as allowed by law;

f. That the costs of this action, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and as otherwise permitted by law, be taxed against Defendant;

g. That all issues so triable be tried before a jury; and

h. That the Court grant such other and further relief as it deems just and proper.

This the 28th day of October 2026.


s/Lawrence Wooden
Lawrence Wooden
State Bar No. 47199
HW Legal Group
10130 Mallard Creek Rd.
Suite 300, Charlotte NC 28262
Telephone: 704-665-5838
*Attorney for Plaintiff*

s/Omar Bradford
Omar Bradford, Esq
FL State Bar No. 90444
The Advisory PLLC
5100 Poplar Avenue, Suite 2700
Memphis, TN 38137
Telephone: 347-224-7144
*Pro Hac Vice Attorney for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 29, 2026, I transmitted a true and correct copy of the foregoing document via ECF to the following individual(s):

Mary Grace Miller
Fisher Phillips
227 West Trade Street.
Suite 220
Charlotte, NC 28202
mgmiller@fisherphillips.com
*Counsel for Defendant*

Lawrence Hilton
Fisher Phillips
227 West Trade Street.
Suite 220
Charlotte, NC 28202
lhilton@fisherphillips.com
*Counsel for Defendant*

/s Lawrence Wooden
Lawrence Wooden